ORIGINAL

Approved: _____
ELISHA KOBRE/JASON LINDER/TAREK HELOU
Assistant United States Attorney/
Trial Attorney, FCPA Unit, Criminal Division, Fraud Section
Assistant Chief, FCPA Unit, Criminal Division, Fraud Section

Before: HONORABLE JAMES C. FRANCIS
United States Magistrate Judge
Southern District of New York

**16 MAG 7960**

- - - - - - - - - - - - - - - - x
: **SEALED COMPLAINT**
UNITED STATES OF AMERICA :
: Violation of
- v. - : 18 U.S.C. §§ 1956, 1957
:
MAHMOUD THIAM, : COUNTY OF OFFENSE:
: NEW YORK
Defendant. :
:
- - - - - - - - - - - - - - - - x

U.S. DISTRICT COURT FILED DEC 12 2016 S.D. OF N.Y.

SOUTHERN DISTRICT OF NEW YORK, ss.:

CHRISTOPHER MARTINEZ, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation (the "FBI"), and charges as follows:

Count One

1. From in or about 2009 up to and including at least in or about August 2011, in the Southern District of New York and elsewhere, MAHMOUD THIAM, the defendant, a United States person, in an offense taking place in the United States, knowingly engaged in and attempted to engage in monetary transactions in criminally derived property that was of a value greater than $10,000, to wit, wire transfers of funds in excess of $10,000 from a bank account in Hong Kong under THIAM's control to, among other things, a bank account in New York, New York, such property having been derived from a specified unlawful activity, to wit, proceeds of bribes paid to THIAM in violation of laws of the Republic of Guinea prohibiting bribery of a public official to influence THIAM, in his position as Minister of Mines and Geology of the Republic of Guinea, to promote the award to particular firms of exclusive and valuable business interests in the Republic of Guinea.

(Title 18, United States Code, Sections 1957 & 2.)

### Count Two

2. In or about November 2010, in the Southern District of New York and elsewhere, MAHMOUD THIAM, the defendant, a United States citizen, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions, to wit, wire transfers, represented the proceeds of some form of unlawful activity, unlawfully and knowingly, did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, to wit, proceeds of bribes paid to THIAM while THIAM was Minister of Mines and Geology of the Republic of Guinea, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B), to wit, THIAM transferred $375,000 to a bank account in Malaysia to conceal his ownership and control of a $3,750,000 estate in Dutchess County, New York.

(Title 18, United States Code, Sections 1956(a)(1)(B) & 2.)

The bases for my knowledge and for the foregoing charge are, in part and among other things, as follows:

3. I am a Special Agent with the FBI. I have been an FBI Special Agent for approximately six years and I am assigned to a squad that focuses on foreign corruption cases. As part of my work at the FBI, I have received training regarding fraud and white collar crimes, including foreign corruption and money laundering. I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, including my examination of reports and records, interviews I have conducted, and conversations with other law enforcement officers and other individuals. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, unless noted otherwise.

### OVERVIEW OF THE SCHEME TO LAUNDER BRIBERY PROCEEDS

4. As described in greater detail below, MAHMOUD THIAM, the defendant, a United States citizen who was Minister of Mines and Geology of the Republic of Guinea (the "Minister of

2

Mines") in 2009 and 2010,[1] engaged in a scheme to accept bribes from senior representatives of a Chinese conglomerate and to launder that money into the United States and elsewhere. More specifically, in exchange for such bribe payments, THIAM, used his position as Minister of Mines to facilitate the award to the Chinese conglomerate of exclusive and highly valuable investment rights in a wide range of sectors of the Guinean economy, including near total control of Guinea's valuable mining sector.

5.  In order to covertly receive the bribes, MAHMOUD THIAM, the defendant, opened a bank account in Hong Kong (the "Thiam Hong Kong Account") and misreported his occupation to the Hong Kong bank to conceal his status as a public official. THIAM then transferred millions of dollars in bribe proceeds from this Thiam Hong Kong Account to, among other things, a bank account belonging to THIAM and THIAM's wife in the United States; a Malaysian company that facilitated and concealed the purchase of a $3,750,000 estate in Dutchess County, New York; private preparatory schools attended by THIAM's children; and at least one other West African public official.

6.  In furtherance of the scheme, MAHMOUD THIAM, the defendant, lied to two banks based in Manhattan and on tax returns filed with the Internal Revenue Service in order to conceal his position as a foreign public official and the source of the funds in the Thiam Hong Kong Account. Overall, THIAM received in the Thiam Hong Kong Account bribes totaling approximately $8.5 million from the Chinese conglomerate.

### RELEVANT ENTITIES AND INDIVIDUALS

7.  MAHMOUD THIAM, the defendant, is a citizen of the United States who served as Minister of Mines from in or about early 2009 through in or about late 2010. THIAM maintains residences in New York, New York and in Dutchess County, New York (the "Dutchess County Estate").

8.  HK Firm-1 and HK Firm-2 (collectively, the "Chinese Conglomerate") are two companies which are based at the same address in Hong Kong (the "Hong Kong Address"). In addition to sharing a common address, HK Firm-1 and HK Firm-2 share at least two directors and share other management

---

[1] In or about 2009, THIAM's title was Minister of Mines, Geology, Energy and Hydraulics. In or about 2010, THIAM's title changed to Minister of Mines and Geology. THIAM's position throughout his tenure will be referred to herein as Minister of Mines.

personnel. The Chinese Conglomerate is involved in, among other things, developing natural resources in Africa.

9. "Executive-1" through "Executive-5" are officers, directors or senior executives of the Chinese Conglomerate. In particular, from e-mails sent by MAHMOUD THIAM, the defendant, and from annual returns filed with the Hong Kong Companies Registry, I have learned, among other things, that Executive-1 is Chairman of the Board of Directors of one or both of HK Firm-1 and HK Firm-2; Executive-2 is Chief Executive Officer ("CEO") of HK Firm-1; Executive-3 is a director of both HK Firm-1 and HK Firm-2; and Executive-4 and Executive-5 are executives of HK Firm-1. In addition, HK Firm-1 is partially owned by a particular company based in Angola (the "Angolan Company") which, in or about 2009 and 2010, was headed by a particular individual ("Executive-6").

10. HK Affiliate-1 and HK Affiliate-2 are Singapore-based companies respectively controlled by and affiliated with HK Firm-1 and HK Firm-2 (the "Chinese Affiliates"). The names of HK Affiliate-1 and HK Affiliate-2 are, respectively, nearly identical to those of HK Firm-1 and HK Firm-2. HK Affiliate-1 and HK Affiliate-2 share a common address in Singapore. Executive-2, who is CEO of HK Firm-1, is listed in incorporation documents as the sole shareholder of both HK Affiliate-1 and HK Affiliate-2.

## THIAM NEGOTIATES AND PROMOTES THE AWARD OF VALUABLE MINING RIGHTS AND OTHER CONCESSIONS TO THE CHINESE CONGLOMERATE

11. From interviews with officials of the Republic of Guinea and from my participation in this investigation, I know that the Republic of Guinea possesses substantial and extremely valuable mineral reserves, particularly bauxite, iron ore, gold and diamonds. Mining of these mineral reserves, and the granting of such mining rights, also known as concessions, to private companies in exchange for an interest in the output of the mines or other compensation, is a major source of revenue for the Republic of Guinea. Despite its great mineral wealth, the Republic of Guinea is among the poorest countries in Africa, in part as a result of corruption by public officials in the granting of mining and other concessions.

12. From my interview of a high ranking official of the Republic of Guinea who served as a senior adviser to the Prime Minister of the Republic of Guinea before and during the period when MAHMOUD THIAM, the defendant, was Minister of Mines

4

("Senior Guinean Official-1") I have learned, among other things, the following:

      a. In or about 2009 and 2010, MAHMOUD THIAM, the defendant, was Minister of Mines. In this capacity, THIAM had substantial powers over mining in the Republic of Guinea. These powers included defining and directing government policy with respect to mines, negotiating mining permits, and substantial influence in the granting of mining permits and concessions to private entities seeking to conduct mining operations in the Republic of Guinea.

      b. THIAM's power as Minister of Mines was magnified at the time because the government of the Republic of Guinea then in place – a military dictatorship that took power in December 2008 – was in need of money and therefore sought to attract investors seeking valuable mining concessions.

      c. In or about 2009, Senior Guinean Official-1 learned from the Prime Minister of the Republic of Guinea that THIAM was going to bring significant investors to the Republic of Guinea. During a subsequent cabinet meeting, THIAM proposed that the Republic of Guinea enter into a partnership with HK Firm-2.

      d. THIAM was the main government official responsible for conducting the negotiations with HK Firm-2 resulting in a "Shareholder's Agreement," further described below, which awarded the Chinese Conglomerate, through its affiliates, exclusive and valuable investment rights in a wide range of sectors of the Guinean economy, including near total control of Guinea's mining sector. Representatives of HK Firm-2 sent drafts of the Shareholder's Agreement to THIAM, who provided those drafts to others for review.

      e. In or about 2009, prior to the execution of the Shareholder's Agreement, THIAM traveled to China and Hong Kong on multiple occasions to meet with leadership of the Chinese Conglomerate to negotiate the terms of the Shareholder's Agreement. As described below, on one trip to Hong Kong to meet with representatives of the Chinese Conglomerate, THIAM opened a bank account in Hong Kong in which he subsequently received approximately $8.5 million from senior executives and officers of the Chinese Conglomerate.

      f. THIAM initialed each page of the Shareholder's Agreement.

13. The Shareholder's Agreement, by which the Chinese Conglomerate, through its affiliates, was given exclusive and valuable concessions in a wide range of sectors of the Guinean economy, was entered into after two preliminary agreements between the Republic of Guinea and HK Firm-2 which were executed just six days apart: a "Memorandum of Understanding" dated on or about June 6, 2009, and a "Master Agreement" dated on or about June 12, 2009. From my review of these documents, and from my review of a draft translation of the Master Agreement, which is in French, I have learned, among other things, the following:

    a. The Memorandum of Understanding required the Republic of Guinea, among other things, "to send a high level delegation to Singapore within three weeks in order to finalise the . . . agreement" between the Republic of Guinea and HK Firm-2 establishing a joint venture between the Republic of Guinea and HK Firm-2. Under the Memorandum of Understanding, the primary business of this joint venture would be HK Firm-2's "financing and investment of projects in the Republic of Guinea."

    b. The Master Agreement provided the framework for the establishment of a "joint venture" through which HK Firm-2 was to obtain exclusive and valuable rights to conduct business in the Republic of Guinea. The Master Agreement provided that the parties would enter into a "Shareholders Agreement" that would be "the operative agreement" governing the joint venture for the projects.

14. On or about October 10, 2009, the Republic of Guinea entered into a "Shareholder's Agreement" with the Chinese Affiliates. From my review of the Shareholder's Agreement, I have learned the following among other things:

    a. The joint venture through which the Chinese Conglomerate would obtain business interests in the Republic of Guinea was a private company incorporated in Singapore under the name Africa Development Corporation Pte., Ltd. ("ADC"). The Chinese Affiliates owned a total of 85% of ADC – the vast majority of the "joint venture" – and the Republic of Guinea owned the remaining 15% of ADC.

    b. The Shareholder's Agreement provided the Chinese Conglomerate, through the Chinese Affiliates, with exclusive and valuable rights to conduct business operations in a broad range of sectors of the Guinean economy, including mining. Among other things, the Republic of Guinea was required to "procure that ADC and [its subsidiaries] obtain all projects

6

contracts," which include services in the sectors of water, electricity, housing, port, fisheries, telecommunication, airport, airline, logistics, road, railway, as well as "invest[ing] and operat[ing] diamond, iron, bauxite, gold and mineral concessions . . . in the Republic of Guinea." The Shareholder's Agreement further provided that, subject to the laws and regulations in force, "[t]he Republic of Guinea shall give full exclusivity to ADC [and its subsidiaries] in respect to" the projects set forth in the Shareholder's Agreement and Master Agreement.

    c. With regard to mining rights, the Shareholder's Agreement provided that the Republic of Guinea must grant to the Chinese Conglomerate, through the Chinese Affiliates, "the right to be the first and strategic shareholder with the Republic of Guinea of a national mining company ("NMC")." The Shareholder's Agreement further requires the Republic of Guinea, among other things, to "transfer to NMC its equity stakes in existing exploration and operating mines owned by the Republic of Guinea with other shareholders"; "use NMC as the vehicle to own all existing and future exploration and operating mines in which the Republic of Guinea has full ownership and control"; and "use the NMC as the vehicle to own and hold all existing and future mining opportunities from time to time."

    d. The Shareholder's Agreement was signed by Executive-4, an executive of HK Firm-1, on behalf of both HK Firm-1 and HK Firm-2. From my interview with another high ranking official of the Republic of Guinea who served in the Ministry of Mines of the Republic of Guinea during the period when MAHMOUD THIAM, the defendant, was Minister of Mines ("Senior Guinean Official-2"), and from Senior Guinean Official-2's review of initials on the Shareholder's Agreement, I have learned that THIAM initialed each page of the Shareholder's Agreement.

    e. The Shareholder's Agreement was signed on behalf of the Republic of Guinea by both the Minister of Justice and Minister in the President's Office in Charge of Economy and Finance. During interviews that I and other members of law enforcement conducted of these ministers, they both stated, in substance and in part, that they had not read the Shareholder's Agreement before signing it and that they had signed the Shareholder's Agreement at the direction of another senior official of the Republic of Guinea.

15. E-mails obtained through a judicially authorized search of an e-mail account belonging to MAHMOUD THIAM, the defendant (the "Thiam E-Mail Account"), confirm THIAM's central role in promoting and negotiating the "joint venture" with the Chinese Conglomerate. These e-mails include the following:

a. On or about June 6, 2009, the same day as the Republic of Guinea entered into the Memorandum of Understanding with HK Firm-2, THIAM e-mailed a contact at a credit and risk insurance company based in China stating, in pertinent part, "Its mahmoud. How r u. I am now in guinea, conakry [the capital of the Republic of Guinea] as minister of mines and energy. We have a visit from a group called [a name similar to HK Firm-2][2] headed by [Executive-1] and [Executive-3]. Can u tell me if u know them or can u find out?"

b. On or about June 13, 2009, THIAM sent an e-mail regarding negotiations with representatives of the Chinese Conglomerate and implementation of the agreement stating, in pertinent part, "Had chairman of [the Angolan Company which owns, in part, HK Firm-1] here for 2 days with chairman of [HK Firm-2]. Great prospects. More important developed [sic] great relationship with both . . ."

c. On or about July 2, 2009, THIAM received an e-mail from Executive-2 referencing "the matter of our future cooperation" and "your coming visit to Singapore with [Executive-1]." The e-mail also attaches certain "documentation material" to be completed "for the purpose of establishing our cooperation structure" and states that "[m]y colleague, [Executive-4], who is now station[ed] in Conakry will provide you any assistant [sic] you required in collating all these materials."

d. On or about July 9, 2009, THIAM wrote an e-mail, in French, to the Prime Minister of the Republic of Guinea to provide a report "on our mission in Asia with [HK Firm-2]." In this e-mail, a draft translation of which I have reviewed, THIAM described his attendance in Singapore at a "ceremony for the creation of the African Development Corporation, ADC" and the participation in this ceremony of the "Guinean and Chinese parties." Based upon my knowledge, training, experience, and

---

[2] Based upon my knowledge, training and experience and my participation in this investigation, I believe THIAM was referring to HK Firm-2 but misidentified that firm with a similar name due to THIAM's lack of familiarity with that entity.

8

participation in this investigation, I believe that in this e-mail THIAM is describing his attendance – as the senior Guinean official of the "high level delegation" to Singapore described in the June 6, 2009, Memorandum of Understanding – at the creation of the ADC through which the Chinese Conglomerate would receive exclusive and valuable interests in many sectors of the Guinean economy.

      e. On or about September 25, 2009, the same day on which as described below THIAM received a $3 million bribe from Executive-1, THIAM sent an e-mail to an associate stating, in pertinent part, "[w]rite to [Executive-2] ceo of [HK Firm-1] asking him to org[anize] a meeting with chairman [Executive-1] in hong kong or singapour . . . "

**THIAM'S RECEIPT AND CONCEALMENT OF BRIBES FROM SENIOR OFFICIALS OF THE CHINESE CONGLOMERATE AND THE LAUNDERING OF THOSE BRIBES**

      16. From my review of records provided by a particular bank based in Hong Kong (the "Hong Kong Bank"), I have learned that, during approximately the same period when MAHMOUD THIAM, the defendant, negotiated, promoted, and initialed the Shareholder's Agreement with the Chinese Conglomerate, THIAM opened a bank account in Hong Kong and received in this account approximately $8.5 million from senior representatives of the Chinese Conglomerate. In particular, I have learned the following among other things:

      a. On or about September 24, 2009 – approximately two weeks before the signing of the Shareholder's Agreement – THIAM opened the Thiam Hong Kong Account at the Hong Kong Bank. THIAM was the sole account holder for the Thiam Hong Kong Account. The Thiam Hong Kong Account was opened and serviced at a branch of the Hong Kong Bank located in the same building as the Hong Kong Address where the Chinese Conglomerate is based. In connection with the opening of the Thiam Hong Kong Account, THIAM provided the Hong Kong Bank with his home address and date of birth.

      b. In connection with opening the Thiam Hong Kong Account, THIAM signed an "opening form" listing certain information (the "Account Opening Form"). Among other things, THIAM listed his "nationality" as "France"; his "Job Nature" as "Other Professional Jobs"; his "Job Title" as "Consultant"; his "Employer/Business Name" as "Thiam Mahmoud"; and his "Indicated Income per month" as "200,000 or above."

c. Nowhere on the Account Opening Form did THIAM state that he was, at the time, Minister of Mines or provide any other indication of his association with the Republic of Guinea. Based upon my knowledge, training, experience, and participation in this investigation, I believe that THIAM purposely concealed his nationality and true occupation as a public official of the Republic of Guinea to conceal the bribes THIAM expected to soon thereafter receive in the Thiam Hong Kong Account.

d. On or about September 25, 2009, the day after THIAM opened the Thiam Hong Kong Account, and approximately two weeks before the execution of the Shareholder's Agreement, Executive-1, who was Chairman of one or both of HK Firm-1 and HK Firm-2, transferred from Executive-1's account, approximately $3 million to the Thiam Hong Kong Account. On or about September 30, 2009, five days later, HK Firm-1 transferred to Executive-1's account approximately $3 million, the same amount as Executive-1 had days earlier transferred to the Thiam Hong Kong Account.

e. On or about March 15, 2010, Executive-5, an executive of HK Firm-1 based in Hong Kong, transferred from Executive-5's bank account, another approximately $3 million to the Thiam Hong Kong Account. On or about the same day, HK Firm-1 transferred the same amount, $3 million, to the bank account of Executive-5.

f. On or about June 2, 2010, Executive-3, a Director of both HK Firm-1 and HK Firm-2, transferred another approximately $2 million to the Thiam Hong Kong Account. On or about November 29, 2010, Executive-3 transferred an additional approximately $500,000 to the Thiam Hong Kong Account. In and around the dates of these payments, HK Firm-1 made substantial transfers to Executive-3's account including approximately $10 million on or about September 10, 2009 and another approximately $10 million on or about November 26, 2010.

g. From in or about September 2009 through in or about July 2011, THIAM made numerous transfers in amounts exceeding $10,000 from the Thiam Hong Kong Account to himself and others. These transfers include, among others: transfers totaling at least approximately $1.3 million to a personal bank account at a particular bank located in New York, New York ("New York Bank-1") which was in the name of THIAM and THIAM's wife (the "Thiam New York Bank-1 Account"); transfers totaling approximately $88,767 to two private preparatory schools in Manhattan attended by THIAM's children; a transfer of

10

approximately $46,375 to a piano company in the United States; a transfer of approximately $250,000 to a construction firm that performed work on THIAM's Dutchess County Estate; and a transfer of approximately $560,000 to a foreign minister of a West African country different from the Republic of Guinea.

    h. On or about November 12, 2010, THIAM also transferred $375,000 from the Thiam Hong Kong Account to a company based in Kuala Lumpur, Malaysia (the "Malaysia Company"). As set forth below, I believe that THIAM made this transfer for the purpose of reimbursing an associate of THIAM's who agreed to assist THIAM's concealment of the bribe proceeds in the Thiam Hong Kong Account to fund, in part, the $3,750,000 purchase of THIAM's Dutchess County Estate.

    17. Based upon my review of e-mails from the Thiam E-Mail Account and from New York State property records, I believe that the purpose of the $375,000 wire transfer by MAHMOUD THIAM, the defendant, on or about November 12, 2010 from the Thiam Hong Kong Account to the Malaysia Company was to conceal the use of bribe receipts for the purchase of the Dutchess County Estate. In particular, I have learned the following:

    a. From a New York State Real Property Transfer Report (the "Property Transfer Report"), I have learned that, on or about November 9, 2010, a particular company based in Mozambique (the "Mozambique Company") purchased the Dutchess County Estate, which includes approximately 30 acres of land, for $3,750,000.

    b. While the Dutchess County Estate was nominally purchased by the Mozambique Company, property records from New York State show that THIAM and his wife were the true beneficial owners of that estate. In particular, and among other things, I have learned that: the Property Transfer Report is signed on behalf of the buyer, the Mozambique Company, by THIAM's wife; the deed for the purchase of the Dutchess County Estate lists the address of the purchaser as THIAM's then current residence in Manhattan (the "Thiam Manhattan Address"); and an application for a building permit for the Dutchess County Estate lists the names of the owners of record for the property as THIAM and THIAM's wife.

    c. From my review of an e-mail sent on or about November 1, 2010, to THIAM by an individual based in Mozambique ("Mozambique Individual-1"), I have learned that in this e-mail Mozambique Individual-1 described a $375,000 wire transfer on or

11

about November 3, 2010, by the Mozambique Company for a down payment for the purchase of the Dutchess County Estate and, in the same e-mail, directed THIAM to pay the same amount, $375,000, to the Malaysia Company.

        d. One week later, on or about November 8, 2010, THIAM directed the transfer of $375,000 in bribe proceeds from the Thiam Hong Kong Account to the Malaysia Company to reimburse the outlay of $375,000 by the Mozambique Company five days earlier to purchase THIAM's Dutchess County Estate. On or about November 12, 2010, the Hong Kong Bank transferred $375,000 to the Malaysia Company, as THIAM had directed.

### THIAM'S LIES TO UNITED STATES BANKS AND ON TAX RETURNS TO CONCEAL HIS POSITION AS MINISTER OF MINES AND THE SOURCE OF FUNDS IN THE THIAM HONG KONG ACCOUNT

        18. As described below, from bank records, e-mails obtained from the Thiam E-Mail Account, and records from the Internal Revenue Service ("IRS"), I have learned that, in or about 2009 and 2010 while MAHMOUD THIAM, the defendant, was Minister of Mines for the Republic of Guinea, THIAM repeatedly lied to banks in the United States and the IRS to conceal his position as a public official of the Republic of Guinea and regarding the source of funds in the Thiam Hong Kong Account.

        19. From records for the Thiam Hong Kong Account and the Thiam New York Bank-1 Account and e-mails in the Thiam E-Mail Account, I have learned the following:

        a. From in or about September 2009 through at least March 2010, MAHMOUD THIAM, the defendant, made at least eight transfers, each approximately $100,000 or more, from the Thiam Hong Kong Account to the Thiam New York Bank-1 Account. These eight transfers totaled approximately $1.3 million.

        b. On or about March 25, 2010, an employee from New York Bank-1 (the "Compliance Officer") spoke with THIAM by phone. During this call, THIAM falsely stated, in substance and in part, that the funds in the Thiam Hong Kong Account came from business transactions and consulting jobs in prior years. THIAM stated that he had not done any consulting in the past 15 months.

        c. Also on or about March 25, 2010, the Compliance Officer e-mailed THIAM seeking information regarding certain "high value wires" THIAM had sent from or received into the Thiam New York Bank-1 Account.

d.  THIAM e-mailed a letter to the Compliance Officer on or about March 26, 2010 responding to this inquiry (the "Compliance Response"), stating, in pertinent part, that during his tenure as Minister of Mines for the Republic of Guinea he "has been maintaining [his] family in NY from [his] savings" and that the funds in the Thiam Hong Kong Account "are derived from business transactions done over the years with" a particular individual THIAM names and describes in the Compliance Response as "a friend and business partner" (the "Partner"). The Partner is not an officer or employee of the Chinese Conglomerate or its affiliates.

e.  Based upon my review of records for the Thiam Hong Kong Account showing that prior to the date THIAM sent the Compliance Response the only significant transfers into the Thiam Hong Kong Account were the two $3 million transfers from Executive-1 and Executive-5 described above, I believe THIAM's statements in the Compliance Response regarding the source of the funds in the Thiam Hong Kong Account and his means of support while a public official in Guinea were false.

f.  On or about March 26, 2010, prior to e-mailing the Compliance Response to the Compliance Officer, THIAM e-mailed a draft of the response to the Partner. Later that day, the Partner replied, in pertinent part, "[l]ooks fine if they don't dig too deep. We can justify with [other transactions]. . . To show real transactions." THIAM replied later that day, in pertinent part, "Cool."

g.  On or about June 3, 2010, New York Bank-1 closed the New York Bank-1 Account.

20.  From records for the Thiam Hong Kong Account and records provided by another bank in New York, New York ("New York Bank-2"), I have learned the following:

a.  On or about June 7, 2010, approximately four days after New York Bank-1 closed the Thiam New York Bank-1 Account, MAHMOUD THIAM, the defendant, opened a new account at New York Bank-2 (the "Thiam New York Bank-2 Account"). At the time THIAM opened the Thiam New York Bank-2 Account, in response to inquiries by New York Bank-2, THIAM stated to an employee of New York Bank-2 (the "New York Bank-2 Employee") that he was employed as chairman of a private company engaged in mining and natural resources consulting (the "Company") and listed the Company's address as the Thiam Manhattan Address. THIAM did not inform the New York Bank-2 Employee that he was then employed as

13

Minister of Mines for the Republic of Guinea. THIAM also falsely told the New York Bank-2 Employee that he had been formerly employed in Hong Kong as a banker.

        b.    On or about June 9, 2010, two days after MAHMOUD THIAM, the defendant, opened the Thiam New York Bank-2 Account, THIAM transferred approximately $300,000 from the Thiam Hong Kong Account to the Thiam New York Bank-2 Account.

        c.    Shortly after opening the Thiam New York Bank-2 Account, New York Bank-2 learned from news reports that MAHMOUD THIAM, the defendant, was then Minister of Mines for the Republic of Guinea.

        d.    On or about July 19, 2010, the New York Bank-2 Employee interviewed THIAM at New York Bank-2. During this interview, THIAM admitted that he was Minister of Mines for the Republic of Guinea. THIAM also stated during this interview that he was not currently affiliated with the Company, which THIAM had previously stated was his employer, because such an affiliation would present a conflict of interest with his position as Minister of Mines. THIAM further falsely stated that the source of the funds he had transferred to the Thiam New York Bank-2 Account was savings from past employment and proceeds from the sale of land in Africa.

        21.    From my review of United States federal tax returns filed by MAHMOUD THIAM, the defendant, for tax years 2009 and 2010 (respectively, the "Thiam 2009 Tax Return" and "Thiam 2010 Tax Return"), each of which is signed by THIAM, the period during which THIAM was Minister of Mines for the Republic of Guinea, I have learned the following:

        a.    The Thiam 2009 Tax Return and Thiam 2010 Tax Return each list THIAM's occupation as "private banker" for the Guinean "Ministry of Mines and Geology."

        b.    The Thiam 2009 Tax Return lists THIAM's total income as $13,498. Nowhere in the Thiam 2009 Tax Return did THIAM report his receipt of $3 million from Executive-1 on or about September 25, 2009. Moreover, THIAM did not file, for the tax year 2009, a "Report of Foreign Bank and Financial Accounts" ("FBAR"), as required for United States persons with a financial interest over a financial account located outside the United States with a value exceeding $10,000 at any time during the calendar year.

    c. The Thiam 2010 Tax Return lists THIAM's business income as approximately $5,865,864. This business income is listed on the Thiam 2010 Tax Return as having derived from THIAM's principal business of "Consulting" with the business address listed as the Thiam Manhattan Address. The Thiam 2010 Tax Return further reports THIAM's acquisition of ownership interests in or about 2010 – while THIAM was Minister of Mines for the Republic of Guinea – of ten foreign corporations, each with Guinea as the principal place of business and each engaged in "mining" as the principal business.

### THIAM'S VIOLATIONS OF THE GUINEAN PENAL CODE RELATING TO BRIBERY OF A PUBLIC OFFICIAL

    22. From my review of an English translation of the Penal Code of the Republic of Guinea (the "Guinean Penal Code") in effect from at least in or about 2009 through at least in or about 2010, I have learned that the Guinean Penal Code contains a section titled "Interference Incompatible with their Status of Officials in Affairs or Commerce and Illegal Advantages." From my review of provisions in this section, I believe that the bribery scheme conducted by MAHMOUD THIAM, the defendant, as described above, in which THIAM received millions of dollars from the Chinese Conglomerate in exchange for, among other things, valuable mining rights in the Republic of Guinea, was an offense under several provisions of Guinean law. In particular, the Guinean Penal Code contains the following provisions among others:

    a. "Whoever will have solicited or accepted offers or promises, solicited or received gifts or presents for the purpose of: 1) Engaging in an act or abstaining from engaging in an act of his/her functions or profession, whether fair or not, but not subjected to salary, while being . . . an administrative or judiciary or military civil servant, or associated civil servant, officer or agent of a public administration or citizen in charge of a public service ministry . . . shall be punished by [a term of imprisonment and a fine]."

    b. "Any official, any civil servant, any agent of the Government who will have openly or by way of a simulated act or through the intervention of persons acquired or received some interest either in acts or awards in companies or state-run firms, which he/she administered or oversaw entirely or in part at the time of the act, shall be punished by [a term of imprisonment and a fine]."

    c. "Any civil servant who will have directly or indirectly acquired or received any interest, whether:

    1) In acts, awards or state-run firms which he/she administered or oversaw entirely or in part at the time of the act;

    2) In private companies, public-private partnerships or companies with government financial participation, under his/her oversight or control;

    3) In contracts awarded in the name of the State with one of the companies named in the preceding paragraph;

    \*  \*  \*

shall be punished by [a term of imprisonment and a fine]."

    d. "Any clerk, employee, or employee who is salaried or remunerated in any way, whether directly or through an intermediary, who without the knowledge and without the permission of his/her boss will have requested or accepted offers or promises or who will have received gifts, presents, commissions, discounts or premiums for the purpose of engaging in or omitting in engaging in an act [that is part of] his/her employment, shall be punished by [a term of imprisonment and a fine]."

    e. "Whoever will have solicited or accepted offers or promises, solicited or received gifts or presents for the purpose of obtaining . . . functions or employment or favors granted by public authority, contracts, companies or other benefits resulting from agreements signed with the public authority or administration placed under the control of public power or, generally speaking, a favorable decision of such authority or administration and will have thus abused his/her real or alleged influence, shall be punished by [a term of imprisonment and a fine]."

WHEREFORE, deponent prays that an arrest warrant be issued and MAHMOUD THIAM, the defendant, be arrested and imprisoned or bailed, as the case may be.

CHRISTOPHER MARTINEZ
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
12th day of December 2016

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK